# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF GUAM

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Criminal Case No. 09-00036 |
| Plaintiff, | |
| vs. | **ORDER RE: MOTION TO SUPPRESS** |
| **JOAHNN L. GARRIDO,** | |
| Defendant. | |

Before the court is Defendant Joahnn L. Garrido's "Motion to Suppress" ("the Motion" or "Motion"). *See* Docket No. 11. The issues raised therein have been briefed (*see* Docket Nos. 14, 34) and argued to the court (*see* Docket Nos. 29, 33). Having considered all of the arguments in light of the facts and applicable law, the court hereby **GRANTS** the Motion in its entirety and **DISMISSES** this case, for the reasons set forth below.

## I. FACTUAL BACKGROUND

This case is related to *United States v. Michael R. Cepeda*, D. Guam Crim. No. 09-00028-001. Defendant Joahnn L. Garrido ("Defendant") is, or was, the girlfriend of Michael R. Cepeda ("Michael"), and has been charged with Misprision of a Felony for allegedly disposing of evidence linking Michael to the crime in his case.

### A. Tracking Down Michael R. Cepeda

On February 26, 2009, the Circle K 76 Gas Station in Sinajana was robbed. Docket No. 14 at 1:22-23. The perpetrator wore a motorcycle helmet, a long-sleeved shirt or sweater, and gloves. *Id.* at 2:4-5. He fled on a motorcycle; the cashier was able to discern and write down its

license plate number. *Id.* at 2:11-14. After tracing ownership of the motorcycle through several different persons, officers of the Guam Police Department ("GPD") ultimately learned that the motorcycle had last been given to Joey Perez, a childhood friend of Michael's. *Id.* at 2:16-18.

### B. First Encounter with Defendant: March 6, 2009

On March 6, 2009, GPD Officers Anna Marie Kuper and Roque Cruz went to Joey Perez' home. Docket No. 14 at 2:18-19. Upon arriving, they saw Michael—who was then unknown to them—carrying a motorcycle helmet and walking to a blue car that had a person seated in the driver's seat. *Id.* at 2:19-20. Officer Cruz instructed Michael to stop; however, still carrying the helmet, Michael fled on foot and escaped. *Id.* at 2:20-21.

The GPD officers then turned to the blue car to speak with the driver, who identified herself as Joahnn L. Garrido. Docket No. 14 at 2:25. Defendant identified the individual who had fled the scene as Michael, stated that she was his girlfriend, and that she lived with him, and his sister Rose, in Yona. *Id.* at 3:1-9. She further stated that Michael worked at Global Recycling, and had recently been released from prison. *Id.* at 3:3-4. She denied knowing where Joey Perez lived. *Id.* at 3:9-10. Finally,

> Garrido related that when Michael Cepeda came home from work at around 5:00 p.m. [that day], he received a call on his cell phone. Cepeda then instructed Garrido to drive him to Yona, because someone asked him to "pick up a helmet." Cepeda got out of the car in Yona, walked around the former Yona library and returned holding a silver and black helmet. He then ran when he saw Police.

*Id*. at 3:4-8.

After Michael ran off, as the evidence presented at the hearing showed, Officer Kuper told Defendant to inform the police if Michael were to return, as they were interested in talking with him. Later that day, Officers Cruz and Kuper went to Rose Cepeda's house, where Defendant was present. There, Officer Kuper reiterated her request that Defendant contact the police if Michael were to return.

### C. Second Encounter with Defendant: April 8, 2009

The evidence presented at the hearing also showed that, on April 8, 2009, Officer Kuper visited Defendant at her home in Yona. There, Officer Kuper again reiterated her request that Defendant contact the police if Michael were to return.

### D. Third Encounter with Defendant: May 12, 2009

On May 12, 2009, GPD officers received an anonymous tip that Michael was hiding at the Tagachang Beach in Yona. Docket No. 14 at 3:15-16. The GPD had been looking for Michael in connection with an alleged Guam Superior Court parole violation. Docket No. 11 at 2, 5. A force of approximately 35 (thirty-five) GPD officers, Guam Superior Court Marshals, Guam Superior Court Parole officers, Guam Department of Corrections officers, and U.S. Marshals went to Tagachang Beach, found Michael with Defendant—whom they were not looking for—and handcuffed and arrested them both. *Id.*; *see also* Docket No. 14 at 16:4-27.

As the evidence presented at the hearing showed, neither Officer Cruz nor Officer Kuper took part in the arrest of Defendant and Michael. Officer Cruz was present on the scene, but was not part of the team that actually went up on the ridge-line area to arrest Michael.[1] Officer Kuper was not present on the scene.

Defendant was then taken into custody and interviewed. The Government describes the day's subsequent events as follows:

> Officer Roque Cruz met with Joahnn Garrido on May 12, 2009 at 4:35 p.m., advised her of her Constitutional rights which she acknowledged and waived in writing. (Attached Exhibits 1 and 2).
> Officer Roque Cruz conducted an interview with Garrido. Garrido then stated she recalls the date she was with Michael Cepeda when he ran away from the Police. She sated [*sic*] that she was with Cepeda when he received a telephone call. She dropped Cepeda off by the Yona Mayor's Office and watched him walk behind the building. He was not carrying anything in his hands when he got down from the car. A few minutes later, he came running towards the vehicle and was carrying a motorcycle helmet, possibly black and white. When Cepeda saw the Officers running toward him, he ran away.

---

[1] Again, the officers were not looking for Defendant at the time they arrested her.

Garrido then stated that Cepeda received a call from Joey Perez who was at a gas station and was being questioned by Police. Joey Perez stated in Chamorro "Siggie yon chuli I helmet gitate I guma" ("Go and get the helmet at the back of the house.") She stated that she did not see Cepeda during the month of March, he called her in April and told her that he is at the Tagachang area. She went to him on May 8, 2009 and was with him until their arrest on May 12, 2009.

Garrido then stated that Cepeda admitted he got rid of the helmet, but she was not aware of the helmet's present location. Cepeda also instructed her to get rid of the clothes used in the robbery by throwing them in the sewer drain in front of his sister's (Rose Cepeda) house in Yona by Route 4. She admitted she placed two pieces of clothing in a black plastic bag and that she knew that the clothes were used in the robbery. Garrido also stated that she saw Cepeda with a black motorcycle, that she rode with him on the motorcycle to his sister's home in Ipan, Talofofo and then back to Yona. Garrido stated that Cepeda admitted to her that he robbed the Circle K 76 Gas Station and that when he was trying to get away someone grabbed the bag of money. He pushed the motorcycle from the Circle K 76 gas station to Payless.

Garrido was then shown the video footage of the Circle K 76 station robbery. The video depicted a man holding a silver handgun with his left hand, long sleeved sweater with green and blue stripes, helmet with a black and grey design. Garrido responded "He looks like Michael Cepeda" but is unable to see the face because of the helmet covering his head. She stated that the sweater is the same sweater she threw away down the storm drain, the shoes look like Cepeda's shoes, and that she has Cepeda's shoes at her residence. Garrido then stated that Cepeda is left handed. She stated she is willing to show the Police the location of the storm drain.

Garrido provided a written statement on May 12, 2009 at 5:30 p.m. (Exhibit 2) which reads as follows:

> *Mike received a phone call, and me Joahnn and Mike left, parked in front of Mayor's Office (Yona). Mike got down walked towards the Yona Library in between. Mike walked towards the car carring [sic] a helmet black and white. Then he ran. Before that Mike and me Joahnn road a black bike from his sisters house down to Ipan up to Yona drop me off. In part of March Mike come to my house Pulantat in a black Mazda truck. Told him get the truck out. So he left. I don't know. Mike later told meeh [sic] that Joey Perez called him up. Joey said Sigge yon yulio I helmet. So Mike did. I haven't seen Mike since March then April come he called me told meeh [sic] he is staying at Manengon across the water point across up the hill. Then he called me told me he moved to Togachang. Mike said he got rid of the helmet and that I got rid of the clothes in the sewer in front of the sister Rosa's house and*

> *Mike said he did robbed [sic] the gas station and that some guy grabbed the bag of money so he pushed the bike to Pay-Less. I remembered that when Joey Perez called Mike that day Joey Perez said that he was being close questioning at gas station. J.G.*
>
> On May 12, 2009 at 7:25 p.m., Officer Aida Pierce transported Garrido to Route 4, Yona, across from St. Francis Catholic Church where she (Garrido) pointed out the storm drain she threw the clothing Cepeda wore during the robbery of the Circle K 76 Station in Sinajana. On May 12, 2009, at 8:11 p.m. Garrido provided the shoes belonging to Cepeda which were confiscated. (Exhibit 3 and 4)
> At 8:45 p.m. the storm drain was opened and the clothing (two shirts and a bag) were recovered from the sewer. The striped shirt matched the shirt worn during the robbery.
> Joahnn Garrido was booked and released on May 12, 2009 at 11:45 p.m. for the offense of Hindering Apprehension.

Docket No. 14 at 3:22-5:22 (emphasis in original).

In regard to this interview, Defendant states that she "was interrogated by GPD officers," "did not have legal counsel," "has very limited formal education[, in that she] finished 8th grade at age 17," "is also a very unsophisticated woman," and "was hungry, tired, nervous, scared and unaware of the potential charges against her." Docket No. 11 at 2.

### E. Fourth Encounter with Defendant: May 18, 2009

On May 18, 2009, Defendant was again taken into custody by GPD officers. The Government describes the day's events as follows:

> Officer Roque S. Cruz re-interviewed Joahnn Garrido on May 18, 2009. Garrido was advised of her Constitutional rights which she waived in writing. (Exhibit 5)
> Garrido stated that Cepeda also told her get rid of a shoulder bag. She placed the shoulder bag and the two long sleeved shirts into a black plastic bag and threw it in the storm drain. Garrido stated that she saw the news reports of a robbery in the Mangilao area. She asked Cepeda if he had anything to do with the robbery, he told her no. She recalls the day of the robbery February 16, 2009 when Michael Cepeda left the residence in the morning and returned at about 10:00 a.m. That same morning, Cepeda left the residence and returned at 3:00 to 4:00 p.m. He came home riding a black motorcycle, wearing black jeans, a black sweater and a beige bag the same day. She recalls Cepeda speaking on the phone with Joey Perez.
> Garrido stated she also went to the Port Authority to see Joey Perez. She saw Cepeda carrying a plastic bag containing

money which he gave to Joey Perez. She saw Perez give Cepeda a plastic straw of methamphetamine which she and Cepeda smoked. She was told by Cepeda that he robbed the Young Store.

Garrido also stated that she received a call from Michael Cepeda, met him at the Yona Center, and drove Gary Benavente's Car (co-worker of Cepeda). Garrido stated she followed Cepeda who dropped his motorcycle at her aunt's home in Ordot. She informed her aunt that she was parking the motorcycle at her residence. Garrido stated she drove to the Won Market. Cepeda told her to buy drinks, gum and cigarettes. She entered and exited Won Market. Then Cepeda exited the car and entered the store. She stated that Cepeda was about to do something "stupid." Cepeda then turned his shirt inside out, hiding the logo "Chamorro" and was carrying a beige shoulder bag. She parked the car in on the street behind Won Market. Cepeda exited the store running, jumped into the car, told her to drive away fast which she did. Cepeda then stated that he did not get any money because the people in the store pointed a gun at him. She watched Cepeda take a silver gun from his waist area and put the gun in the beige bag. She drove him to her aunt's home in Ordot where Cepeda picked up his motorcycle and she returned the car to Gary Benavente. She stated that Cepeda wore a long sleeved sweater with the logo "Chamorro" inside out, a gray t-shirt, beige colored shoulder bag, white shoes, black pants, and was carrying a grey gun. After they returned the car, Cepeda told her that he hid the motorcycle and gun at Joey Perez' ranch and that both items belonged to Joey Perez.

Officer Piolo confiscated the grey t-shirt that Cepeda wore during the Won Mart robbery. Joahnn Garrido's written statement take May 18, 2009 at 5:30 p.m. ( Exhibit 6) reads:

> *On the night the Officers found the 2 sweaters in the drain hole they also found a bage [sic] shoulder bag. Mike told meeh [sic] to get rid of the bag. That's when I put the bage [sic] bag and the 2 sweater in a black plastic bag and threw it in the drain hole. On the day after the Mangilao robbery I ask Mike did he have anything to do with the robbery and he told me no. I remember the day of the robbery. Mike left the house in the morning came back at 10:00 or 11:00 then Mike left came back at around 3:00 or 4:00 p.m. Came to the house on a black bike black jeans and a black sweater and a bage [sic] bag. Mike was on the phone talking to Joey Perez. Mike and Meeh [sic] went to the Port Authority to meet Joey Perez and we did. Mike and Meeh [sic]. Mike got down of the car got in the truck carrying a plastic bag and the Joey Perez gave Mike a straw of the drug (ice) after I ask Mike what is that in the plastic bag and he said don't worry about it.*

Joahnn Garrido's May 18, 2009 statement written 7:55 p.m.

(Exhibit 7) reads:

> *Mike told me that he robbed Mangilao store name (Young) later that day. Mike and I left to the Port Authority to meet Joey Perez and then Mike got down the car went in [sic]. Joey Perez truck with a plastic bag containing money [sic]. I was at home. Mike called Meeh [sic] to come walk to the center but Joey Perez picked up Mike that morning on the Mangilao robbery. So I did Mike said drive Gary's car and follow me he was driving the bike so we both left drove the car Mike behind meeh [sic] stopped at Ordot. Mike said where can I park the bike I said why he said just where, so I said my Auntie's house. Parked the bike both left. I drove to Sinajana store Won's store. Mike said get down and buy a drink or gum and cigarette. Come out from the store drove around then parked back at Won store. Mike said when I reach closer park the door on the back side. Mike came running to the car I drove back to my Auntie's house. Mike drove the bike followed meeh [sic] back home and then he left a later went to Joey Perez house but before he got out the car Black sweater was backwards. Mike told me that Joey Perez owns a gun and that he parked the black bike at Joey's ranch with the gun coz [sic] it belongs to Joey Perez. Mike said he hid the bike at the jungle at Joey Perez ranch. Joey told Mike to hide it because Ed Cruz was getting raided so Mike did at Joey's ranch. The color of the gun was gray. Mike was wearing a black pants a grey shirt then put a black sweater on but inside out. Which is the Chamorro sweater that the Officers found in the sewer. I still have the gray shirt at home.*

Docket No. 14 at 5:27-8:3.

In regard to this interview, Defendant states:

> Again, Garrido did not have legal counsel. She signed another written waiver of her *Miranda* rights at approximately 4:05 p.m. (See Exhibit C). She wrote a 2-page statement between 5:30 and 6:00 p.m. (See Exhibit D). Officers Cruz and Aguon then took Garrido for a ride in their police car. They continued the interrogation in the car. Garrido allegedly made additional statements during this drive-around interrogation. Garrido was then brought back to GPD headquarters in Tiyan for additional interrogation. Garrido then wrote another 3-page statement between 7:30 and 8:00 p.m. (See Exhibit E). Garrido was finally taken home by GPD officers at approximately 9 p.m.

Docket No. 11 at 2-3.

### F. Fifth Encounter with Defendant: May 26, 2009

Finally, on May 26, 2009, Defendant was taken into custody by local and federal law enforcement officers. The Government describes the day's events as follows:

> Defendant Garrido was interviewed at the A.T.F. Office in Hagatna. She was not in custody, she was permitted to leave the room. . . .
> Garrido was born in 1977 and is 32 years of age. She did attend school up to the 8th grade. She has prior experience with the legal system, particularly with the Superior Court of Guam and with Guam Police Department. Defendant waived in writing her constitutional rights. She is bilingual, able to speak and write both the English and Chamorro language. All questioning by law enforcement was courteous. She was provided with food and drink. She was not deprived of sleep. She was not impaired in any way. Garrido was free to discontinue each of the interviews and the interviews were not unreasonably long. Her will was not overborne.

Docket No. 14 at 14:10-15:10.

In regard to this interview, Defendant states:

> At some subsequent and unknown date, GPD and Federal law enforcement agents again went to Garrido's residence in Yona. They again took her into custody, without probable cause or a warrant, and transported her to the U.S. Bureau of Alcohol, Tobacco and Firearms (ATF) office in Maite. She was interrogated again, this time by GPD and ATF officers and Assistant United States Attorney Rosetta L. San Nicolas. Again she did not have legal counsel. No oral or written *Miranda* warnings were given. Garrido made oral statements. The substance of Garrido's statements at the ATF office are unknown as the government has yet to turn over any reports related to this interrogation.

Docket No. 11 at 3.

\\
\\
\\
\\
\\
\\
\\

## II. PROCEDURAL BACKGROUND

This case commenced on July 8, 2009, when Defendant was charged in an indictment with one count of Misprision of a Felony, in violation of Section 4 of Title 18, United States Code. *See* Docket No. 1.

On August 7, 2009, Defendant filed her Motion. *See* Docket No. 11. After obtaining an extension of time to respond, the Government opposed the Motion on August 26, 2009. *See* Docket Nos. 12-14. Defendant did not reply to the Government's opposition.

On September 21, 2009, the court began a hearing on the Motion, but continued it so that the Government could resolve certain *Henthorn* issues. *See* Docket Nos. 29, 31.

On November 2, 2009, the court resumed and concluded the hearing. *See* Docket No. 33. That day, the court gave the Government leave to file a supplemental memorandum, which the Government did on November 5, 2009. *See* Docket No. 34.

## III. JURISDICTION AND VENUE

The court has jurisdiction in virtue of its "original jurisdiction . . . of all offenses against the laws of the United States." *See* 18 U.S.C. § 3231.

Venue is proper in this judicial district, the District of Guam, because this district is where the report of felony should have been made. *See Bratton v. United States*, 73 F.2d 795 (10th Cir. 1934).

## IV. ANALYSIS

Defendant argues that all, or at least some, of the evidence against her should be suppressed. Her arguments proceed on three theories: (1) arrest without probable cause, in violation of the Fourth Amendment; (2) violation of *Miranda* rights, or invalid waiver thereof, in violation of the Fifth Amendment; and (3) involuntary confessions, in violation of the Fourteenth Amendment Due Process Clause.

### A. Probable Cause Issues

Defendant first argues that the police lacked probable cause to arrest her on May 12, 2009. It is undisputed that there was no warrant for her arrest. Also, both parties acknowledge

Page 9 of 15

Case 1:09-cr-00036   Document 35   Filed 12/02/09   Page 9 of 15

that this particular issue is dispositive, in that if the police lacked probable cause to arrest Defendant on May 12, then all evidence in the case must be suppressed and the case must be dismissed.

**1. Law**

"The Fourth Amendment requires that a law enforcement officer have 'probable cause' to arrest an individual without a warrant." *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005), *cert. denied*, 547 U.S. 1056 (2006). "The test for whether probable cause exists is whether 'at the moment of arrest the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Id*. (quoting *United States v. Bernard*, 623 F.2d 551, 559 (9th Cir. 1980)). Determining "whether probable cause exists requires a 'practical, common-sense' decision based on the totality of the circumstances, including the veracity, basis of knowledge and reliability of the information provided by informants." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 214 (1983)).

"[W]hen specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred." *Rodis v. City & County of San Francisco*, 558 F.3d 964, 969 (9th Cir. 2009) (quoting *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994)). *See also Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1499 (9th Cir. 1996) (holding that officers must have probable cause to believe in motorcyclist's actual knowledge that a certified helmet does not comply with helmet safety laws before ticketing)

The Government argues that, at the time of the first arrest, the arresting officers had probable cause to believe that Defendant had committed, or was committing, the (local) crime of Hindering Apprehension, in violation of Section 55.15 of Title 9, Guam Code Annotated. *See* Docket No. 14 at 16:1-26. That crime is defined as follows:

> A person is guilty of hindering apprehension or prosecution if, *with intent to hinder, prevent or delay* the discovery, apprehension, prosecution, conviction or punishment of another person for the

commission of an offense, he:

> (1) harbors or conceals the other person;
> (2) provides or aids in providing a weapon, transportation, disguise or other means of avoiding discovery or apprehension;
> (3) conceals, alters or destroys and physical evidence that might aid in the discovery, apprehension or conviction of such person;
> (4) warns such person of impending discovery or apprehension . . .
> (5) obstructs by force, intimidation or deception anyone from performing an act which might aid in the discovery, apprehension, prosecution or conviction of such person; or
> (6) aids such person to safeguard the proceeds of or to profit from such offense.

9 G.C.A. § 55.15 (emphasis added).

This is a specific-intent crime, since it requires proof of "intent to hinder, prevent or delay the discovery, apprehension, prosecution, conviction or punishment of another person for the commission of an offense." *See United States v. Lopez*, 482 F.3d 1067, 1077 (9th Cir. 2007) (holding that Oregon's "Hindering prosecution" statute—O.R.S. § 162.325, which is almost identical to 9 G.C.A. § 55.15—defines a specific-intent crime).

### 2. Application

The Government raised two general arguments in opposition to Defendant's Motion. In its briefing, the Government contended that the arresting officers had probable cause to believe that Defendant had committed, or was committing, the crime of Hindering Apprehension because:

- Defendant was with Michael when he fled from the police on March 6, 2009 (Docket No. 14 at 16:20-21);
- Defendant informed the police—on March 6, 2009—that she had driven Michael to Yona "to pick up a helmet" (*id*. at 16:21);
- the police had "received an anonymous tip and from that tip located [Defendant] and [Michael] who were hiding at the Tagachang Beach" (*id.* at 16:22-23); and

1       •       the anonymous tipster "reported that he had overheard [Michael] discussing where he hid the motorcycle" (*id*. at 16:23-24).

The Government concluded that "[t]hese facts and circumstances would cause a reasonably prudent person to believe that the crime of Hindering Apprehension had been committed by Joahnn L. Garrido." *Id*. at 16:24-26.

At the hearing, the Government made a slightly different argument. It emphasized the facts that (1) Defendant was told several times that the police were interested in talking with Michael and (2) Defendant was found with Michael at Tagachang, and argued that these two facts, taken together, would cause a reasonably prudent person to believe that Defendant had committed the crime of Hindering Apprehension. Specifically, the Government argued that, with respect to the Hindering Apprehension statute, the arresting officers had probable cause to believe that Defendant had violated, or was violating, subsections (1) (harboring or concealing), (4) (warning of impending discovery or apprehension) and/or (5) (obstructing by force, intimidation or deception) of the statute.

As a preliminary matter, the court notes that the evidence presented establishes that Officers Cruz and Kuper were *not* among the officers who actually arrested Defendant. Likewise, there was *no* evidence presented relating to the actual arresting officers, and *no* indication that the actual arresting officers had been briefed about Defendant or otherwise had any knowledge of her. In short, there was no evidence whatsoever that the actual arresting officers had probable cause to believe that Defendant had committed any crime. This in itself may be enough to grant Defendant's motion. However, to be careful, the court will impute to the arresting officers knowledge of all the relevant facts known by Officers Cruz and Kuper.

Even on this (unfounded) assumption of imputed knowledge, the court rejects both versions of the Government's argument. To begin with, the court notes that since the Government's theory depends on a specific-intent crime, the Government must show that, at the time of the arrest, the arresting officers had probable cause to believe that Defendant was acting with an "intent to hinder, prevent or delay the discovery, apprehension, prosecution, conviction

or punishment of another person for the commission of an offense." 9 G.C.A. § 55.15.

With respect to the Government's first argument, the court does not think that the four cited facts are "sufficient to warrant a prudent man" in having probable cause to believe that Defendant was acting with the required specific intent. The first fact, that Defendant was with Michael when he fled from the police on March 6, 2009, is circumstantial and innocuous. The second fact, that Defendant told the police that she had driven Michael to Yona to pick up a helmet, is more *helpful* to the police than it is indicative of any intent to "hinder, prevent or delay" discovery, because it connected Michael to the crime that the police were investigating. Moreover, the evidence suggests that this statement was given freely, and with candor; such attributes would not justify a reasonable person in believing that the speaker is trying to frustrate, deceive, or conceal something. The third fact, that Defendant was with Michael when he was found at Tagachang, is also circumstantial and innocuous—in conjunction with the first fact, it is somewhat interesting, but it is hardly surprising, given that Defendant and Michael were a couple. And the fourth fact, that the anonymous tipster reported hearing Michael discussing where he hid the motorcycle, has nothing to do with Defendant.

On one hand, then, there are the facts that Defendant was with Michael—her boyfriend—when he fled the police, and was with him when the police eventually caught up with him. On the other hand, there are the facts that, on March 6, 2009, Defendant (1) *identified* Michael as "the individual who fled the scene with the helmet after seeing Police," and (2) described the circumstances surrounding Michael's retrieval of the helmet. *See* Docket No. 14 at 3:1-8. These actions are more fairly described as *assisting* the police in their investigation than as *hindering* it in any way.

Thus, at the time Defendant's first arrest, the only way that she figured in the police investigation was *as a source of useful information*—albeit one often found with her boyfriend. This being so, the court does not think that the arresting officers could possibly have had a *reasonable belief* that Defendant had an "intent to hinder, prevent or delay the discovery, apprehension, prosecution, conviction or punishment of another person for the commission of an

offense." While perhaps the arresting officers *actually* believed this, the court cannot see how they could have *reasonably* believed this—unless they somehow reasonably believed that Garrido had hidden the Michael-related evidence in the storm drain, *which the Government does not claim*. Consequently, the Government's first argument does not establish that the arresting officers had probable cause to arrest Defendant on May 12, 2009.

The foregoing analysis applies just as well to the Government's second argument. In addition, the court does not see any evidence that would have given the officers probable cause to believe that Defendant had violated, or was violating, subsections (1) (harboring or concealing), (4) (warning of impending discovery or apprehension) and/or (5) (obstructing by force, intimidation or deception) of the Hindering Apprehension statute. With respect to subsection (1), the court does not see how a reasonable person could think that Defendant was harboring or concealing Michael when they were found together on a *public beach*. Moreover, absent evidence that Defendant was positively helping Michael to hide himself, the court can see no indication of harboring or concealing. With respect to subsection (4), there was neither evidence nor intimation that Defendant was attempting to warn Michael of his impending discovery; indeed, the evidence presented at the hearing was that the two neither ran nor resisted arrest. And with respect to subsection (5), there was no evidence whatsoever that Defendant had used force, intimidation or deception in any way, so the court cannot see how an arresting officer could reasonably have believed as much.

In sum, the court rejects both versions of the Government's argument. Thus, the police lacked probable cause to arrest her on May 12, 2009. Since this issue is dispositive—as, again, both parties recognize—no further analysis is needed.

\\
\\
\\
\\
\\

## V. CONCLUSION

For the reasons given above, Defendant's motion is **GRANTED** in its entirety. As such, the case is **DISMISSED**.

**SO ORDERED**.



/s/ Frances M. Tydingco-Gatewood
　　Chief Judge
Dated: Dec 02, 2009